First Trust and Savings Bank of Kankakee, Illinois, Administrator De Bonis Non with Will of Frank Belleau Annexed, and Claude M. Granger, Administrator to Collect of Estate of Mary Belleau, Appellees, v. Arthur N. Powers, Appellant.

Gen. No. 9,901.

Heard in this court at the October term, 1944. Opinion filed February 8, 1945. Rehearing denied April 30, 1945. Released for publication May 1, 1945.

JOHN A. MAYHEW, JOHN H. BECKERS, both of Kankakee, and POPPENHUSEN, JOHNSTON, THOMPSON & RAYMOND, of Chicago, for appellant; FLOYD E. THOMPSON, ADOLF LOEB, both of Chicago, and JOHN H. BECKERS, of Kankakee, of counsel.

LEN H. SMALL and SAMUEL H. SHAPIRO, both of Kankakee, and WERNER W. SCHROEDER, of Chicago, for certain appellee.

PER CURIAM.

The appeal in this case is prosecuted from a decree of the circuit court of Kankakee county entering judgment against appellant in favor of First Trust and Savings Bank of Kankakee, Illinois, as administrator *de bonis non* with the will of Frank Belleau annexed, in a proceeding against appellant for accounting as trustee under an alleged contract dated July 1, 1929, between appellant and Frank Belleau in his lifetime. The judgment is for the face amount of the instrument, $25,000, plus interest from its date at 6 per cent

per annum, aggregating $45,095.68, less $1,954.15, the amount of a counterclaim filed by appellant, making the net amount of the judgment $43,141.53.

The instrument sued on reads as follows:

"Memorandum of agreement made and entered into this first day of July, A. D. 1929, by and between Frank Belleau of the City of Bradley, County of Kankakee, and State of Illinois, and Arthur N. Powers of the City and County of Kankakee, State of Illinois, hereinafter referred to as parties of the first and second part, respectively:—

"Witnesseth, that,—

"Whereas, said first party desires to deposit with said second party the sum of twenty-five thousand dollars ($25,000.00) for investment, and said second party, as Vice President of the Illinois Light and Power Company, has purchased and will hereafter purchase certain acreage of real property required in connection with the hydro-electric power project of said Power Company bordering upon the Kankakee River and in connection with the purchase of property actually required for said project, said second party has purchased and will be able to purchase additional lands which may later be sold at a good profit above present cost, in which profit, said first party desires to share and said second party is willing that said first party now deposit said sum of twenty-five thousand dollars ($25,000.00) and receive the proportionate share of the profits to be made in connection with the purchases to be made by said second party and the parties hereto have reached an understanding which they desire reduced to writing.

"Now, Therefore, for and in consideration of the premises and the sum of one dollar ($1.00) and other good and valuable considerations, each to the other in hand paid, the receipt of which is hereby mutually acknowledged, and in consideration of the mutual covenants hereinafter set forth, the parties hereto agree and contract with each other as follows:

"1. Said first party has this day paid over to said second party the sum of twenty-five thousand dollars ($25,000.00) which said second party hereby acknowledges having received and which said sum of money is to draw interest at the rate of six per cent per annum from date hereof.

"2. Said second party will continue to purchase property for said hydro-electric power project and in connection therewith will purchase from time to time other lands abutting said lands acquired for such project—which in the opinion of said second party will become valuable and may later be sold as and when said hydro-electric power project shall have been completed at a price in excess of the sum now paid therefor.

"3. It is understood and agreed by the parties hereto that all such contemplated purchases shall be made by said second party because of the knowledge he has of said project and property values; also by reason of the fact that said party knows the most attractive parcels to be acquired with respect to their later sale and use for home sites and that each purchase will be made at the lowest possible price to be paid therefor.

"4. It is understood and agreed that all such property so purchased by said party will be held and not sold until (a) either said hydro-electric power project has been completed ready for operation, or (b) said property will not be sold until the price obtainable therefor has increased approximately five (5) times its original cost, in either of which events, said second party shall have the sale thereof and shall divide the proportionate profits thereof as hereinafter provided.

"5. It is understood and agreed by and between the parties hereto that as and when such property is ultimately sold, there shall first be paid to said first party the entire sum of money now deposited with said second party, to which shall be added and likewise paid to said first party a sum of money equal to six

per cent interest per annum from the date of this agreement to the date of payment; and that after said sums are paid to said first party, the proceeds of any sale then made—to the extent of the proportionate share of funds so deposited by said first party shall be thereafter divided equally and one-half paid to said first party and one-half be retained by said second party.

"In Witness Whereof, the parties hereto have hereunto set their hands and seals the day and year first above written.

"Arthur N. Powers (Seal)
"Frank Belleau (Seal)"

From the stipulation between the parties it appears that Frank Belleau and his wife, Mary, executed a joint will on May 3, 1932. Mr. Belleau died on October 28, 1933, and the will, as to his estate, was admitted to probate on January 9, 1934. The surviving widow died on November 5, 1935. It further appears from the briefs of the parties, that she was appointed executrix of the will; that nothing was done in her husband's estate until appellee bank was appointed administrator *de bonis non* with the will annexed on July 8, 1939, and that nothing was done towards the administration of Mrs. Belleau's estate until July 14, 1939, when Claude M. Granger was appointed administrator to collect. The inventory in Frank Belleau's estate, filed August 2, 1941, shows real estate in Kankakee county, subject to a trust deed dated December 8, 1939, and which, at the time the inventory was filed, had been foreclosed; 18 shares of common stock of the Commonwealth Edison Co., par value $25 per share, valued at $450; cash on hand, $139.50; notes and accounts, none. No mention of the alleged contract sued on is made in the inventory.

Appellant filed a claim in the county court against the estate of Mr. Belleau on October 9, 1941, for $1,954.15, based on an account between them extending

from March 24, 1928 to February 1, 1934. From the stipulation between the parties, it appears that during the hearing on the claim, counsel for the administrator advised the court that he had just been informed of the document in controversy, which he wished to file as a counterclaim, and, permission to do so was granted. It further appears from the stipulation that instead of filing a counterclaim, counsel for appellees filed a motion praying for leave to commence legal action on the instrument in the circuit court, which motion was granted; and that the administrator did not file nor introduce the instrument in evidence, nor offer any evidence at the hearing on appellant's claim, in the county court.

Appellant filed a motion in the circuit court to dismiss the complaint, on the ground that jurisdiction lay exclusively with the county court, and assigns for error the denial of his motion. Section 196, article XVII, of the Probate Act (Ill. Rev. Stat. 1943, ch. 3, par. 348 [Jones Ill. Stats. Ann. 110.445]) provides that a claim or a counterclaim may be filed in favor of the estate and against any claimant named in the claim. Section 199 (par. 351 [Jones Ill. Stats. Ann. 110.448]) provides for judgment over only in cases where the counterclaim is heard in the county court. Sec. 207 (par. 359 [Jones Ill. Stats. Ann. 110.456]) provides that the provisions of art. XVII relating to the jurisdiction of the probate court over claims against estates shall not be construed to exclude the jurisdiction of other courts. Manifestly, a counterclaim is not pending in court until it is filed therein. In the case at bar a counterclaim was not filed in the county court, and no evidence in support of it was ever presented in that court. It is apparent that the proposed counterclaim was never a pending matter in the county court, and that the jurisdiction of that court, if any, never attached. Cases cited by appellant to the effect that the court first obtaining

jurisdiction of a matter retains it to the exclusion of all other courts have no application here. A statute providing that a counterclaim may be filed is permissive only and not mandatory. A defendant may file his cross action by way of setoff or counterclaim or he may bring his original suit. (*Morton v. Bailey,* 1 Scam. (2 Ill.) 213, 214, 215; *Quick v. Lemon,* 105 Ill. 578, 585; *Chicago, D. & V. R. Co. v. Field,* 86 Ill. 270, 272, cited in 8 A. L. R. 696.) We are of the opinion that the circuit court did not err in denying the motion to dismiss the complaint for the reason assigned.

The complaint alleges the filing of appellant's claim against the estate, and that the plaintiff bank, as administrator as aforesaid, "in and about the conduct of its defense of the estate of Frank Belleau against the claim so asserted, discovered the existence of an agreement dated July 1, 1929, between the said Frank Belleau, deceased, and Arthur N. Powers, a true copy of which said agreement is attached hereto marked 'Exhibit A' and by reference made a part hereof. That in and by said agreement the said Arthur N. Powers admitted the receipt from the said Frank Belleau of the sum of $25,000 for investment," etc.: and further alleges that the fund is a trust fund, that no part thereof nor any interest thereon had ever been paid by the defendant, and that the plaintiffs are entitled to an accounting, with an *ad damnum* of $25,000 and interest.

The answer of appellant denies the receipt of the money, the alleged trust relation, and that the plaintiffs are entitled to any accounting. It further denies that he made, executed and delivered the instrument, and denies any consideration therefor, and alleges the cause of action did not accrue within 10 years next before the commencement of the suit, and is barred by the statute of limitations. Amendments to the answer allege the bar of the 5-year statute of limitations, laches, and that Frank Belleau was not in sufficient

financial condition to have obtained or secured the sum of $25,000 to advance to appellant as alleged in the complaint, either at, prior to or after July 1, 1929. By way of counterclaim appellant also alleged the same claim as filed by him in the county court. Replies to the answer and counterclaim and to the amendments to the answer were filed. All the pleadings on both sides were verified.

Two witnesses testified on behalf of appellees. They were the vice president and the assistant cashier of the City National Bank of Kankakee. Their testimony was with respect and to the effect of the genuineness of the signature of appellant to the instrument in controversy. Appellant was the only other witness in the case. He identified the account between him and Mr. Belleau upon which he based his counterclaim.

It also appears from the stipulation of the parties that since the date of the instrument to the time the suit was filed there were no conveyances to or from appellant individually, or as vice president of the Illinois Light and Power Company, affecting the title to lands one mile distant on each side of the Kankakee River in the vicinity of the proposed power project.

It is urged by appellant that the writing introduced was not the original but a copy, and therefore not admissible in evidence. A photostatic copy of the exhibit will be found on pages 103 to 105 of the record. It is clearly apparent from the photostatic copy that the three typewritten pages were bound with a manuscript cover, the top portion of which is folded down 1¼ inches over the top margin of the first page of the instrument, all fastened together by the usual means employed for such purpose. On that portion of the manuscript cover which extends down over the first part of the instrument, appears in handwriting the following notation: "Copy of original contract between Frank Belleau and Arthur N. Powers." This notation is no part of the instrument, which is type-

written. The impression of the type is so clearly reflected by the photostatic copy that it is impossible to determine whether it is an original impression or a carbon impression. The photostatic copy shows a complete instrument signed by the parties under seal. The best evidence rule is intended to operate to bar the admission of any evidence which by its nature, indicates there is other evidence more direct, positive and conclusive. However, the rule which excludes evidence of copies of documents where the documents themselves are available as proof does not apply to documents and writings which are executed in duplicate or multiplicate form. It is well settled that where a writing is executed in duplicate or multiplicate, each of the parts is the writing which is to be proved because by the act of the parties, each is made as much the legal act as the other. Each part of a document so executed is regarded as the primary evidence of its contents, and the original need not be produced. Thus, the different impressions of a writing produced by placing carbon paper between sheets of paper and writing upon the exposed surface are, according to the prevailing view, duplicate originals, and may be introduced in evidence without accounting for the nonproduction of the original, unless it appears that the parties did not intend such papers to operate as the original evidence of the matters therein contained. (*People ex rel. Thompson v. Chicago, R. I. & P. R. Co.,* 329 Ill. 467, 474, 475; *People ex rel. Roche v. Chicago & E. I. Ry. Co.,* 315 Ill. 424, 427; 20 Am. Jur. (Evidence), p. 380, sec. 427; 32 C. J. S. (Evidence), p. 749, sec. 821; Wigmore on Evidence (2nd Ed.), vol. 2, p. 831, sec. 1233 (1). Under the circumstances in this case, the best evidence rule does not operate to exclude the instrument from being admissible in evidence. But there is a reason why the instrument was not admissible in evidence. Appellant's answer expressly denies delivery of the instrument, and there is

no allegation in the complaint and no testimony in the record that it was ever delivered between the parties, or that it was ever in the possession of Frank Belleau after it was signed. While possession of an instrument by one of the parties thereto raises a presumption of delivery (*Dunn v. Heasley,* 375 Ill. 43, 48; *White v. Smith,* 338 Ill. 23, 27; *Dunlop v. Lamb,* 182 Ill. 319, 324), there is no such showing here. There is no showing that the instrument was found among the effects of the decedent, or where it was discovered, or in what manner appellees obtained possession of it. Thus, there is an entire lack of any evidence of delivery. It is a fundamental principle of law that delivery of a written contract is indispensable to its binding effect, and it must take effect upon its execution and delivery or not at all. (*Jordan v. Davis,* 108 Ill. 336, 340, 341; *Wilson v. Wilson,* 158 Ill. 567, 574.) The evidence of how appellees obtained possession of the instrument was peculiarly within their knowledge and control. The failure to produce it gives rise to the presumption that such evidence, if produced, would be unfavorable to them on the question of delivery. (*Belding v. Belding,* 358 Ill. 216; *Page v. Keeves,* 362 Ill. 64.)

Furthermore, although the payment of the money to appellant was denied by his answer under oath, appellees produced no testimony, other than the instrument itself, which tended to show payment of the money by Mr. Belleau to appellant. On the other hand, there is some evidence in the record which has the opposite tendency. The counterclaim of appellant, excluding a payment of court costs in Mr. Belleau's estate, of $19.15, shows payments by appellant to Mr. Belleau, or for his account, of $6,318.05 from March 24, 1928 to February 20, 1933, only the first item of which $10 was paid before the date of the instrument in controversy. $2,500 of the total was for the purchase of the interest of Mr. Belleau and his wife in a farm, the

check for which was made payable to both of them, and is credited by receipt of the deed. This leaves $3,618.05 loaned by appellant to Mr. Belleau, of which $1,883.05 was repaid from time to time, leaving a net balance unpaid of $1,935 at the time of Mr. Belleau's death. Another significant fact is that the joint will of Mr. and Mrs. Belleau executed on May 3, 1932, after reciting that having made such provision as they deemed adequate for their son during their lifetime, and giving him a legacy of $5, made appellant the sole beneficiary of their estates after the death of the survivor of them, by the following provisions in paragraph 5 thereof; "For a number of years prior to the date of the execution of this, our last will and testament, Arthur N. Powers, residing . . . has been a real friend; aiding and befriending us almost constantly—both in an advisory capacity and financially—during which, he refused to accept any compensation whatever. We had in him a true friend; always loyal, ready and willing to assist us and as evidence of our sincere appreciation of him, it is our mutual desire and we wish and we, each of us, hereby direct—that upon the death of both of us, all of our property then remaining—both real and/or personal—shall become immediately vested in and become the sole property of said Arthur N. Powers," etc. The sixth paragraph of the will made like provision for appellant's youngest daughter in case of his prior death. The will is inconsistent with the claim of appellees. The power plant was never built. More than four years elapsed between the date of the alleged contract and the death of Mr. Belleau, and appellant had made no purchase of any property under the alleged agreement. It is not reasonable to assume that, while borrowing money from appellant, Mr. Belleau would leave $25,000 with him for investment in an abandoned project. During the two years that Mrs. Belleau was executrix of her husband's will she made no claim, so far as the record

shows, that the alleged contract was in force, or that appellant was holding $25,000 or any other amount thereunder belonging to her husband's estate, and she died leaving the joint will as her will. The inventory filed in Mr. Belleau's estate on August 2, 1941, almost eight years after his death, makes no mention of the alleged agreement or deposit as an asset. The borrowing of Mr. Belleau from appellant during the period above mentioned and the will of Mr. and Mrs. Belleau tend to show that Mr. Belleau was not in a financial position to make an investment of $25,000, but on the contrary show that appellant assisted him financially both before and after the date of the alleged agreement. Another significant feature of the document is that the date, the name of the party of the first part, and the amount mentioned as the investment are in handwriting, filled in blank spaces left in the typewritten matter for that purpose. From this it is obvious that Mr. Belleau had nothing to do with the preparation of the instrument. It is equally apparent that $25,000 would not purchase any great quantity of land. The instrument does not provide for any investment by appellant, yet Mr. Belleau's share of the profits was to be in proportion to his investment, all of which suggests the probability that it was contemplated that others would execute like contracts and make investments in the enterprise. Subsequent events tend to show that the plan was never consummated.

If these were the only defects in the case we would reverse the decree and remand the cause. But, even if these matters were out of the way, there is a fatal illegal consideration in such a contract. While raised only by the petition for rehearing, it is nevertheless the duty of the court to notice it on its own behalf. (*Oscanyan v. Arms Co.*, 103 U. S. 261, 267; *Critchfield v. Bermudez Asphalt Paving Co.*, 174 Ill. 466, 483.) The Illinois Light and Power Company is

a public utility. As suggested by appellant's counsel, it was to the interest of the consumers, and the public generally, as well as to the stockholders, that the project be located where it could be most efficiently and economically operated, and that only such lands be acquired as were necessary for the economical and efficient operation of the plant, and that such lands be acquired as cheaply as possible. The instrument recites that appellant was vice president of the utility, and as such, had purchased and would thereafter purchase lands in connection with a power project bordering upon the Kankakee river, and in connection with the purchase of property actually required therefor, had purchased and would be able to purchase additional lands which might later be sold at a good profit, in which Mr. Belleau was to share through his investment therein. However innocent the intention of the parties might have been, such a contract would inevitably tend to tempt and influence appellant in the selection of tracts for the power project which adjoined tracts that could be acquired and sold at a good profit to himself and Mr. Belleau, even though they were not located so as to be for the most economical and efficient operation of the power project, and even though they were not purchased at the lowest price possible, and tempt him to buy more land for the project than was necessary.

In *Bestor v. Wathen*, 60 Ill. 138, certain officers of a railroad company and of a construction company, entered into an agreement with certain landowners to locate a town on their land in consideration of such officers sharing in the sale of town lots. In the course of the opinion (pp. 141–142), the court said: "A court of equity will not enforce a contract resting upon such official delinquency, or even tending to produce it. Such is the character of the contract before us. If we enforce it, we lend the sanction of the court to a class of contracts the inevitable tendency of which is to

make the officers of these powerful corporations pervert their trusts to their private gain at the price of injury at once to the stockholders and to the public. . . . In this particular case no wrong may have been done, and yet public policy plainly forbids the sanction of such contracts because of the great temptation they would offer to official faithlessness and corruption.'' A court of equity will not lend its aid to enforce or cancel such a contract, but will leave the parties in the position in which they have placed themselves. (*Estate of Smythe v. Evans,* 209 Ill. 376, 383; *Wright v. Cudahy,* 168 Ill. 86, 92; *Critchfield v. Bermudez Asphalt Paving Co., supra.*) A full exposition of the above principles, with numerous citations, is found in *Dodson v. McCurnin,* 178 Iowa 1211, 160 N. W. 927, L. R. A. 1917 C 1084.

This is not an action for money had and received, as claimed by appellee, but the pleadings, and particularly the stipulation between the parties, show that it is based solely upon the alleged written contract in controversy. The instrument sued on, if ever delivered between the parties, is void as against public policy, and affords no ground for recovery thereunder. Consequently, remanding the cause would serve no good purposes. The decree is therefore reversed.

*Decree reversed.*